CENTRAL ICE CREAM COMPANY, INC., Plaintiff and Counterdefendant-Appellant, *v.* SWEETHEART CUP CORPORATION *et al.*, Defendants and Counterplaintiffs-Appellees.

First District (1st Division)    No. 62845

Opinion filed June 22, 1976.

Theodore M. Becker and J. Samuel Tenenbaum, both of Becker & Tenenbaum, of Chicago, for appellant.

Kirkland & Ellis, of Chicago (Ronald L. Engel, James M. Amend, and William A. Streff, Jr., of counsel), for appellees.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

These proceedings were commenced by the filing of a complaint for declaratory judgment by Central Ice Cream Company, Inc. (Central), against Sweetheart Cup Corporation (Sweetheart) and Maryland Cup Corporation (Maryland) (jointly defendants). Defendants filed a joint answer to the complaint together with an affirmative defense and a counterclaim seeking recovery from Central of $224,414.69 for quantities of supplies sold and delivered to Central. On September 9, 1975, after a hearing, the trial court entered an order finding the issues in favor of defendants and entering summary judgment of $224,414.69 against Central. Central has appealed.

In passing upon the motion for summary judgment, the trial court had before it: first set of 64 interrogatories directed to Central by defendants and answer of Central thereto; second set of interrogatories numbered 65 to 101 also directed to Central and answer thereto; motion by defendants for production of documents by Central; documents produced in accordance therewith by agreement of the parties; discovery deposition of Thomas N. Cummings, president of Central, commencing on September 25, 1974, and continuing intermittently on various dates until October 10, 1974, comprising record pages 190 to 788 inclusive; motion of defendants for summary judgment supported by memorandum submitted by counsel for defendants comprising 41 pages of the record; additional motion by defendants for judgment dismissing the complaint and awarding the relief sought in their counterclaim; affidavit of John M. Foley, treasurer of Sweetheart regarding balance due from Central; response by Central to defendants' motion for summary judgment made by counsel for plaintiff comprising 12 pages of the record; affidavit by Thomas N. Cummings in support of the complaint; and, finally, reply

memorandum by defendants' counsel in support of their motion for summary judgment. The last of these documents was filed August 27, 1975.

In this court, Central urges that when reasonable persons could draw different inferences from the same facts, trial issues of fact exist; the motion for summary judgment should be denied if the record discloses that a triable issue of fact exists; summary judgment cannot be entered where there is any material question to be determined; and, if an examination of the pleadings, deposition, etc., discloses that there is a genuine issue as to any material fact, motion for summary judgment should be denied. Defendants urge that summary judgment was granted based on Central's own version of the material facts; that is, that Central's admissions provide a proper basis for summary judgment; Central cannot create genuine issues of fact by arguing with itself that the admissions contained in its president's deposition conflict with the allegations of its complaint; Central's assertion of the existence of triable issues with respect to immaterial facts cannot preclude the entry of summary judgment and there are no conflicting inferences or opinions to be drawn from the undisputed facts as the only question presented was the application of settled law to the undisputed facts. Defendants also contend that application of settled law to the admitted material facts requires the granting of summary judgment in favor of defendants.

It has been repeatedly held that summary judgment is proper, "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment or decree as a matter of law." (Ill. Rev. Stat. 1975, ch. 110, par. 57(3); *Heidelberger v. Jewel Companies, Inc.* (1974), 57 Ill. 2d 87, 92, 312 N.E.2d 601, and *Carruthers v. Christopher & Co.* (1974), 57 Ill. 2d 376, 380, 313 N.E.2d 457.) In the case before us no affidavits have been filed in support of the motion for summary judgment. As above shown, defendants have relied primarily upon a lengthy memorandum prepared by their counsel and also upon the testimony of Thomas N. Cummings given in his discovery deposition. Similarly, no affidavits have been filed by Central in opposition to the motion for summary judgment and the record contains only an affidavit by Cummings as to the truth and veracity of the allegations in Central's complaint.

■■ Our study of the record and briefs, together with the oral arguments presented by counsel for both sides, has convinced us that there are important and material disputed issues of fact presented by this record so that the case is not one in which the remedy of summary judgment should be invoked. Accordingly, we reverse the order for summary judgment and remand the cause for trial.

An analysis of the factual issues is required in this case. However, in view of our decision that the cause is to be tried, we wish expressly to abstain from expressing a conclusion of any kind which might tend to usurp the function of the trier of fact. Therefore, we wish it clearly understood that the following factual statement is based only upon the record before us as above detailed and is presented solely and only in connection with our analysis of that record as pertinent to the inquiry whether there actually exists disputed issues of material fact.

Otherwise stated, we are not attempting in any manner to detail facts but simply to show the existence of factual disputes between the parties which, in our opinion, effectively negate the propriety of summary judgment. In doing so we depend upon the following legal analysis showing the quantum of care required to be exercised by any court in availing itself of the admittedly salutary remedy of summary judgment. The cases bearing upon this issue are numerous. It has been frequently held that the purpose of summary judgment is to determine whether any factual issue exists. If there is a material issue of fact, the motion for summary judgment should be denied. (*Carlson v. Prestige Casualty Co.* (1975), 28 Ill. App. 3d 926, 930, 329 N.E.2d 477, and cases there cited.) Before a motion for summary judgment can be allowed, the right of the moving party must be clear and free from doubt and determinable solely as a question of law. (*O'Brien v. Kawazoye* (1975), 27 Ill. App. 3d 810, 815, 327 N.E.2d 236, and authorities there cited.) Although summary judgment has been described as "an important tool in the administration of justice * * *" so that its use should be encouraged in a proper case, this remedy has also been described as a "drastic method of disposing of litigation." *Green v. McClelland* (1973), 10 Ill. App. 3d 350, 352, 293 N.E.2d 629, *leave to appeal denied*, 54 Ill. 2d 592, and cases there cited.

■■ As we would expect, it follows necessarily, and has been held, that summary judgment should "be awarded with due caution in view of its drastic nature." (*Rivan Die Mold Corp. v. Stewart Warner Corp.* (1975), 26 Ill. App. 3d 637, 640, 641, 325 N.E.2d 357, and cases there cited.) Otherwise stated, the standard to be applied by trial and reviewing courts is "that the right to summary judgment must be clear beyond question." (*Powell v. R. J. Anderson, Inc.* (1970), 124 Ill. App. 2d 1, 5, 260 N.E.2d 103, and cases there cited.) Consequently, "[a]ny doubt as to the right of the moving party to entry of a summary judgment should be resolved by trial rather than by summary judgment." *National Bank v. S. N. H., Inc.* (1975), 32 Ill. App. 3d 110, 117, 336 N.E.2d 115, *leave to appeal denied*, 61 Ill. 2d 602.

Central is engaged in manufacturing ice cream and ice cream products in Chicago. Maryland manufactures machinery and equipment used in the preparation and packaging of ice cream products. Sweetheart is a

wholly owned subsidiary of Maryland. Sweetheart manufactures sugar cones and paper and plastic items in which ice cream products are packed for public consumption.

Central had a business relationship in connection with supplying large quantities of ice cream products to be used on a nationwide basis by the well-known restaurant chain operating under the name of McDonald's Systems Inc. The existence of such a relationship between Central and McDonald's is undisputed. Commencing about December of 1970, Thomas Cummings, president of Central, met with Ray Kroc, apparently one of the executive officers of the McDonald's firm to explore the possibilities of use by McDonald's of a quantity of ice cream cones. This delicacy was to be sold to numerous McDonald's retail outlets and was to be called the "Tripple Ripple" cone. Central first attempted to develop a type of ice cream requested by Ray Kroc which would not drip immediately upon removal from refrigeration but which would remain intact for at least 12 minutes. Central was successful in working out this type of ice cream formula. The executives of McDonald's and Central visualized sales of this item at a possible rate of 100 million per year.

Beginning in April of 1971, defendants loaned or leased a machine to Central which filled ice cream cups for this purpose. Central produced these articles for test marketing by McDonald's. Apparently, with reference to additional machines later provided, no rental was charged for the machines but the affiliated defendants were compensated by sale of cones, and packaging, including dome-shaped plastic lids.

During the latter part of 1971, a new type of packaging was evolved by Central. This consisted of a sugar cone covered by a printed paper sleeve of similar shape, all to be covered by a plastic lid or dome. Central filed an application for a United States patent covering this article in December of 1971. Negotiations were held between Central and defendants with reference to the possibility of obtaining attachments for use with a machine which would pack the containers with ice cream manufactured by Central and seal them with the plastic domes. Central gave specifications to Sweetheart and a drawing of the proposed lid or dome. Various prototypes were designed by Sweetheart and submitted to Central. Eventually a design was accepted by Central and orders were placed with Sweetheart for huge quantities of these dome lids. Delivery began in later March or early April 1972.

At the same time, Sweetheart undertook to supply the paper jackets with the required printing on them. Defendants also designed and fabricated special or "novel" attachments to be used as equipment on the packaging machinery required to fulfill Central's needs. By April 20, 1972, the first of these machines was delivered to Central and placed in operation. Commencing at or about this time, McDonald's would place

various orders with Central for the fabrication and shipment of large numbers of these items consisting of the cone, surrounding sleeve with printing and attached dome, packed with ice cream. These deliveries were ordered for direct shipment to various parts of the United States.

In all of these complicated transactions there was no written contract between Central and McDonald's and no written agreement between Central and defendants except for a written placement agreement, apparently bearing no date, executed by Central and by Maryland covering six so-called "Flex-E-Fill" machines. This agreement includes the following language:

> "4. The undersigned further understands that Maryland Cup Corporation assumes no liability for injuries sustained by any person or employee of the customer from the use of the machine nor does Maryland Cup Corporation assume any liability for failure to keep the machinery in proper condition or repair or for any damages, consequential or otherwise, by whatever means caused, arising out of the use or loss of use of the machinery or damage to the machinery or the time required to repair or replace the machinery."

A difficult element of dispute and material fact is already apparent from the above statement. Defendants contend that there was never "any contract" between Central and McDonald's relative to the supply of cones. This contention of defendants is predicated upon the discovery deposition in which Cummings was asked, "[T]here was no contract of any sort with McDonald's other than you would supply cones to them for test marketing purposes, is that correct." The witness answered that it was correct. However, it appears definitely from other portions of the discovery deposition that there was some contractal relationship between Central and McDonald's. Defendants' brief refers to these dealings as, "a series of unilateral contracts." In our opinion it is impermissible to treat this response by a lay person to a question involving a difficult legal term of art as an admission of fact upon which to base a summary judgment.

From time to time large quantities of these cones were ordered by telephone by various authorized personnel of McDonald's and Central always attempted to fill these orders. It is clear from the record that this contractual relationship between Central and McDonald's was lucrative to Central and presented it with an opportunity of expanding its business to a large degree. In our opinion, the exact nature of these contractual dealings is a material fact which is disputed between the parties and which cannot be determined from the record before us.

Central contends that there was a commitment by defendants to deliver the necessary machinery by April 1, 1972. Cummings testified

flatly concerning the attachments for the machine; "We asked for delivery by April 1st, so we could meet our commitments to McDonald's * * *." Defendants' brief does not concede the existence of such commitment. This is another example of a material and disputed fact because the first machine, together with the necessary attachments, did not arrive at Central's plant until April 20 or April 21, 1972. The second machine was not delivered until May 4, 1972. Defendants contend that Cummings admitted on his deposition that this delay did not cause Central any loss or damage. In fact, Cummings actually testified that he did not believe that sales were lost and added that late delivery of the machine set his company some three weeks behind in satisfying the demands for this item on the east coast. On this narrow issue, therefore, defendants take the position that no damage is attributable to the delay but this contention is not supported by the deposition.

■■ In this and other instances, the testimony of Cummings should not properly be classified as an admission. "To be competent as an admission any statement should possess the same degree of certainty as would be required in the evidence it represents." (*Hudson v. Augustine's, Inc.* (1966), 72 Ill. App. 2d 225, 237, 238, 218 N.E.2d 510, *leave to appeal denied*, 34 Ill. 2d 629.) The above noted testimony by Cummings falls short of meeting this requirement.

On May 1, 1972, Central placed orders for large quantities of the dome lids with defendants. As above shown, this followed lengthy contacts between the parties. Central's theory here is, and the record shows, that these plastic domes were improperly fabricated and did not conform to specifications. The dome lids had a peripheral flange at the bottom of the lid which contained a very small ledge which would run in a horizontal direction when the dome was placed upon the ice cream cone. Central contends that due to the addition of this ledge, the dome was not made in accordance with specifications and that this defect was exceedingly detrimental to the manufacturing process. According to the Cummings deposition, the machinery and the lids as supplied by defendants made production virtually impossible, frustrating and costly. The machinery failed because frequently several lids would be placed together on one cone. Often lids would not fit across the cone. The machines would dispense lids at an improper angle instead of horizontally. In many instances the dome failed to seal itself down tightly on the cone. Often the domes would be emitted from the machine onto the floor. On some occasions failure of the machine to operate properly would drive the dome into the ice cream. In addition the cones were often broken, or partially broken; sometimes with their bottom portions missing.

The deposition testimony is to the effect that Cummings repeatedly took this matter up with representatives of defendants and told them that

Central would seek credit for its losses. They in turn conceded that the specifications submitted to them by Central did not call for a ledge on the plastic dome but that defendants themselves added the ledge in the hope of obtaining a better seal for the ice cream. The defect of existence of this ledge was difficult to find except by measurements as close as several thousandths of an inch. The testimony is that the ledges were "almost impossible" to see with the naked eye. It is agreed that servicemen employed by defendants came to the plant on numerous occasions over an extended time period in an effort to solve the problems involving the dome and the machines and special attachments and to normalize production. Plaintiff, Central, takes the position that these defects were of so serious a nature that the total production from the first five machines was about 50 percent of capacity. Central contends that the deposition shows that it lost prodigious quantities of cones, paper sleeves and plastic domes which were destroyed by malfunction of the machines in addition to the loss of a huge quantity of ice cream.

Central contends in its memorandum that it has substantial records which will reflect its total loss "with reasonable accuracy." The record shows that Central expended money for additional help in an effort to increase production and reduce the loss resulting from these malfunctions of machines and components. Central used its own machinists, maintenance men and engineers together with numbers of factory workers. Central did not receive supplies of the corrected domes from May 30, 1972, when defendants agreed upon the need for such modification, until the middle of July.

Four additional machines with necessary attachments were furnished by defendants and delivered to Central in May and June of 1972. It is undisputed that all parties cooperated in a joint effort to attempt elimination of the production problems. Central did continue to use the domes with the ledge in an attempt to fill its orders; although Sweetheart offered to accept return of all nonconforming lids for full credit. Eventually over one million of these lids were returned by Central to Sweetheart for credit. Cummings did not recall that defendants' people ever requested that use of the machines be halted.

This leads us to additional important and disputed issues of material fact. The construction of the placement agreement to determine if it eliminated all warranties by continued use with knowledge of defects is an issue of law. However, assuming such warranty existed, the issue of waiver thereof raised by defendants is purely a factual issue which the record fails to solve with that degree of finality required for the entry of summary judgment. Furthermore, the placement agreement has no reference to existence of a warranty concerning the dome lids and other components of the package furnished by defendants. The existence of

any warranty here is an issue of fact for which the hearing of testimony is an absolute essential. In this regard, it would be necessary for a trier of fact to hear all of the testimony which the parties might offer regarding their dealings.

This is the only manner in which the existence of a warranty on components furnished by defendant and a waiver thereof, or lack of such waiver, could properly be ascertained. An important factor here would be the contractual relationship between McDonald's and plaintiff. Plaintiff contends that it was obliged to continue use of the faulty machines and components for its protection and to satisfy the demands and repeated orders by McDonald's even if only to a partial extent. The parties raise various legal issues supported by citations including whether Central's use of the machinery and supplies with knowledge of the defects served to waive any warranty of fitness for purpose. We need not consider or decide any of these legal issues because we may not overlook the virtually axiomatic principles that as a general matter existence of a warranty, express as well as implied, breach thereof, existence of waiver of such breach and amount of damages flowing from such breach are all disputed issues of material fact in the case before us.

Nor can these matters be resolved or be declared immaterial because of the offer by defendants to accept return of lids for full credit. As both parties knew, large quantities of these plastic lids or domes had been used in an effort to obtain production and then spoiled and discarded. A determination of the total number and percentage of the domes successfully used presents still another disputed issue of material fact related to a determination of damages.

This analysis demonstrates that the extended discovery deposition upon which defendants so strongly rely illustrates and convinces of the existence of several material and disputed factual issues between these parties.

We cannot agree that this situation is one in which summary judgment is either indicated or proper. To do so would, in our opinion, deprive Central of its rightful opportunity to present the evidence to a trier of fact. The order for summary judgment entered September 9, 1975, is accordingly reversed and the cause is remanded for a full hearing before the trier of fact on Central's complaint, and the counterclaim of defendants.

Order for summary judgment reversed; cause remanded.

BURKE and McNAMARA, JJ., concur.